IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

JUAN PABLO JARQUIN-ESPINOZA,

    Defendant.

No. CR14-0121

REPORT AND RECOMMENDATION

---

## TABLE OF CONTENTS

I.    *INTRODUCTION* ........................................ 2

II.   *PROCEDURAL HISTORY* ................................ 2

III.  *RELEVANT FACTS* .................................... 2

IV.  *DISCUSSION* ......................................... 5
    *A.*    *Seizure* ........................................ 5
    *B.*    *Custodial Interrogation* ......................... 7
        *1.*    *Custody* ................................ 8
            *a.*   *Applicable Law* .................. 8
            *b.*   *Analysis* ....................... 10
        *2.*    *Interrogation* ......................... 16
            *a.*   *Applicable Law* ................. 16
            *b.*   *Analysis* ....................... 17
    *C.*    *Fruits of the Unlawful Interrogation* ........... 19
    *D.*    *Summary* ....................................... 24

V.    *RECOMMENDATION* .................................... 24

## I. INTRODUCTION

On the 18th day of December 2014, this matter came on for hearing on the Motion to Suppress (docket number 22) filed by the Defendant on December 3, 2014. The Government was represented by Assistant United States Attorneys Timothy L. Vavricek and Daniel C. Tvedt. Defendant Juan Pablo Jarquin-Espinoza appeared in person and was represented by his attorney, Rockne O. Cole.

## II. PROCEDURAL HISTORY

On October 30, 2014, Defendant Juan Pablo Jarquin-Espinoza was charged by Indictment with unlawful use of an identification document (Count 1), misuse of a social security number (Count 2), and making a false claim to U.S. citizenship (Count 3). Defendant appeared on November 4 and entered a plea of not guilty. Trial was scheduled before Chief Judge Linda R. Reade on January 5, 2015.

On December 3, 2014, Defendant timely filed the instant motion to suppress. The Government filed its resistance on December 12. Because of the pending motion to suppress, the trial was continued to February 17.

## III. RELEVANT FACTS

The facts underlying the instant motion are generally undisputed. At approximately 11:30 p.m. on September 27, 2014, Defendant walked into the Riverside Casino and presented a California identification card for admittance.[1] The card identified Defendant as Hugo A. Salazar, with a California address. The employee who initially reviewed the card believed it was fake and called Jack Michael, the security shift manager. Michael also believed it was fake and he called for Special Agent Kevin Gould of the Iowa Division of Criminal Investigation ("DCI").

The DCI has an office in the back of the Riverside Casino. At that time, Agent Gould was working the 5:00 p.m. to 3:00 a.m. shift. Gould responded to the front of the

---

[1] A photocopy of the card was introduced as Government's Exhibit 1.

casino and reviewed the California identification card. According to Gould, the electronic scanning device used at the Casino did not "react" to the ID card. In addition, the card appeared to be "washed out," faded, printing on the card which was apparently intended to be holographic was not, in fact, holographic, there was no information on the back of the card, and what was supposed to be a magnetic strip on the back of the card was simply a black line. The identification card was also checked against a book of identification cards kept at the casino.

Agent Gould agreed that the identification card was likely a fake. Gould approached Defendant, identified himself and displayed his badge, and asked Defendant to accompany him to the DCI office at the back of the casino. Defendant agreed and walked with Gould through the casino to the DCI office. Gould and Defendant then sat in an interview room, measuring 10 feet by 12 feet, within the "main office." The interview room contained an L-shaped desk with a computer, a chair behind the desk, two chairs in front of the desk nearest the door, and a shelving unit. Gould testified that Defendant was not free to leave while his investigation was ongoing.

According to Agent Gould, the Riverside Casino is located 15-20 miles from the University of Iowa and it is not uncommon for underage students to use fake identification cards to enter the casino. Gould initially believed Defendant was likely an underage student attempting to gain entry. Other exhibits show Defendant was just a few days short of his 23rd birthday at the time of these events.

Initially, Defendant told Agent Gould that he was Hugo Salazar. Gould then "ran" the ID and was told that there was no record of Salazar either in California or Iowa. Gould learned, however, that the name may be associated with Texas. He then checked a Texas database and it came back to a person arrested for sexual assault in Texas. At that point, Gould believed Defendant may be a sex offender who had failed to register in Iowa.

3

Agent Gould asked Defendant if he had been arrested for sexual assault in Texas. According to Gould, Defendant's response was "slow" and he appeared to be "surprised," but then he "kind of acknowledged yes." Gould did not have much experience with sex offenders, so he contacted Sergeant Kurt Bailey of the Washington County Sheriff's Office for assistance. Because he didn't believe Defendant was being truthful, Gould checked a Texas sex offender registry website and obtained a photo of the Hugo Salazar who was charged in Texas. The photo did not match Defendant. When Gould showed the photo to Defendant, he admitted that he was not Hugo Salazar.

At that time, Defendant gave what is believed to be his real name — Juan Pablo Jarquin-Espinoza. Defendant did not have any documents, however, showing what he represented to be his true name. Agent Gould ran the new name through an Iowa database, with no results. When Gould asked Defendant why he had lied about his name, Defendant said he was in the country illegally and did not want to be deported. Defendant told Gould that he entered the country on a temporary visa in 2008 and had overstayed. Defendant subsequently graduated from Washington High School in Cedar Rapids. To "corroborate his story," Defendant gave Gould information regarding his Facebook page and said he worked as a cook at Heinz in Cedar Rapids.

When Sergeant Bailey arrived at the casino, it was decided Defendant would be arrested for unlawful use of a license or non-operator's ID card. Agent Gould arrested Defendant, but Bailey transported him to the Washington County Jail, where he was fingerprinted, photographed, and released. At no time was Defendant ever given a *Miranda* warning.

Special Agent Benson of the DCI notified Special Agent Tyler Mower of Homeland Security Investigations, who notified Adam Autio, an immigration enforcement agent with Immigration and Customs Enforcement ("ICE"). Autio testified he retrieved Defendant's jail record (Government's Exhibit 2) and used the information to obtain Defendant's Visa

application (Government's Exhibit 4). Autio then reviewed the DCI report and learned that Defendant worked at Heinz in Cedar Rapids. Autio then contacted Heinz and asked to review Defendant's I-9 form. In completing the form I-9, Defendant used the alias Hugo Salazar, together with Salazar's social security number. A warrant was then issued for Defendant's arrest.

Following Defendant's arrest on the federal warrant, Autio read Defendant a statement of his *Miranda* rights and Defendant signed a waiver. *See* Government's Exhibit 5. In the post-*Miranda* interview, Defendant admitted that he had purchased the documents bearing the name Hugo Salazar for $1,000 in Chicago. He used those identifiers in filling out form I-9 so that he would be able to work in the United States.

## IV. DISCUSSION

In his motion to suppress, Defendant asserts that he was unlawfully seized and questioned without being *Mirandized*, in violation of the Fourth and Fifth Amendments. Accordingly, Defendant argues that any evidence obtained as a result of the unlawful interrogation must be suppressed. The Government argues Defendant was not "interrogated" as that term is used for *Miranda* purposes, and was not "in custody" in any event.

### A. Seizure

The Fourth Amendment protects persons "against unreasonable searches and seizures." However, not every contact between the police and the public constitutes a "seizure." The United States Supreme Court has stated repeatedly that a seizure does not occur when a law enforcement officer simply approaches an individual in public and asks questions. *See, e.g.*, *United States v. Drayton*, 536 U.S. 194, 200 (2002) ("Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen."). A seizure does not occur if the

contact remains consensual. *Florida v. Bostick*, 501 U.S. 429, 434 (1991) ("so long as a reasonable person would feel free 'to disregard the police and go about his business' the encounter is consensual and no reasonable suspicion is required.") (internal citation omitted). Here, Defendant seemingly concedes that he was not "seized" when he was initially approached by Agent Gould near the casino entrance.

Defendant argues, however, that he was seized when he accompanied Agent Gould to the DCI office in the back of the casino. "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, 'by means of physical force or show of authority,' terminates or restrains his freedom of movement." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (quoting *Bostick*, 501 U.S. at 434). When Gould initially approached Defendant, he identified himself as a "state police officer" and displayed his badge. Gould then "asked Mr. Jarquin to follow me back to the DCI office." The record is silent regarding whether Gould returned the ID to Defendant before proceeding to the DCI office, but because Gould conducted additional checks in the back, it seems likely that he retained possession of the ID. Gould testified that if Defendant had attempted to "turn around and walk away," Gould would not have let Defendant go. That is, according to Gould, Defendant was "detained for investigative purposes." I do not believe a reasonable person under those circumstances would have felt free "to disregard the police and go about his business." *Bostik*, 501 U.S. at 434. I believe Defendant was seized when Gould took him back to the DCI office.

It does not follow, however, that Defendant's seizure was "illegal" — as claimed by Defendant in his motion — or that it has any particular significance in this case. The Fourth Amendment permits brief investigative stops — so-called *Terry* stops — when the officer has "a particularized and objective basis for suspecting the particular person

stopped of criminal activity." *Navarette v. California*, _____ U.S. _____, 134 S. Ct. 1683, 1687 (2014) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)).

> Police may conduct a brief investigative stop when they have reasonable, articulable suspicion that a person is committing or is about commit a crime. This standard requires that officers be able to point to specific, articulable facts justifying the seizure. Reasonable, articulable suspicion for a *Terry* stop requires less than probable cause of criminal activity, but the suspicion cannot be based on an "inarticulate hunch." The existence of reasonable, articulable suspicion is determined by the totality of the circumstances, taking into account an officer's deductions and rational inferences resulting from relevant training and experience.

*United States v. Horton*, 611 F.3d 936, 940 (8th Cir. 2010) (internal citations omitted). Here, Agent Gould was not acting on a mere hunch, but instead had information to suggest that Defendant was using a fake ID. Accordingly, Gould was permitted under the Fourth Amendment to briefly detain Defendant to investigate his suspicions.

### B. Custodial Interrogation

The principal issue raised by Defendant in his motion to suppress is whether statements made by him in the DCI office are admissible at trial. It is now hornbook law that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Specifically, "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* Here, it is undisputed that Defendant was not given a *Miranda* warning after being led back to the DCI office. The Government notes, however, that *Miranda* applies only to custodial interrogations, and argues in this case that Defendant was neither "interrogated" nor "in custody."

## 1. Custody

### a. Applicable Law

I will first address the issue of whether Defendant was in custody for *Miranda* purposes after being led back to the DCI office, but before he was placed under formal arrest. In *United States v. Griffin*, 922 F.2d 1343 (8th Cir. 1990), the Court stated that "[c]ustody occurs either upon formal arrest or *under any other circumstances* where the suspect is deprived of his freedom of action in *any* significant way." *Id.* at 1347 (citing *Miranda*) (italics in original). More recently, however, the Court has seemingly tightened the definition and stated that restriction on the suspect's movements must be similar to those associated with a formal arrest. *See, e.g., United States v. Perrin*, 659 F.3d 718, 719 (8th Cir. 2011) ("The ultimate question in determining whether a person is in custody for purposes of *Miranda* is whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.") (quoting *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004)). Stated otherwise, "the ultimate test is whether a reasonable person in that position would have felt free to end the interview." *United States v. Sanchez*, 676 F.3d 627, 630-31 (8th Cir. 2012) (quoting *United States v. Aldridge*, 644 F.3d 705, 710 (8th Cir. 2011)).

The applicable standard is easily stated, but is often difficult to apply. *Oregon v. Elstad*, 470 U.S. 298, 309 (1985) (The "task of defining 'custody' is a slippery one."). Custody determinations are "mixed questions of law and fact which require that the entire circumstances of the particular case be carefully assessed." *Griffin*, 922 F.2d at 1347. While the standard expressed in *Perrin* seems to have narrowed somewhat the definition found in *Griffin*, the Eighth Circuit still routinely relies on the factors identified by *Griffin* in determining custody. *See, e.g., Sanchez*, 676 F.3d at 630; *Perrin*, 659 F.3d at 720.

The *Griffin* Court summarized the "indicia of custody" in a "decidedly non-exhaustive" list:

> This inquiry into the indicia of custody has generally focused on an examination of (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*Griffin*, 922 F.2d at 1349. The first three factors tend to mitigate the existence of custody at the time of questioning, while the remaining three factors tend to aggravate the existence of custody. *Id.* That is, affirmative answers to the first three questions would suggest Defendant was not in custody, while affirmative answers to the last three questions would suggest Defendant was in custody.

However, not every factor will be present in every case and "a particularly strong showing with respect to one factor may compensate for a deficiency with respect to other factors." *Id.* The *Perrin* Court reminded us that "*Griffin* is simply a rubric for considering the ultimate issue, not a mandatory checklist." 659 F.3d at 720. *See also Czichray*, 378 F.3d at 827 ("There is no requirement that the *Griffin* analysis be followed ritualistically in every *Miranda* case.").

In arguing that Defendant was not in custody while being questioned in the DCI office, the Government relies heavily on the recent opinion in *Howes v. Fields*, _____ U.S. _____, 132 S. Ct. 1181 (2012). There, a state prisoner serving a jail sentence was escorted by a corrections officer to a conference room, where he was questioned by two sheriff's deputies regarding allegations that he engaged in sexual conduct with a 12-year-old boy before going to prison. The inmate was told on three occasions that he was free

to leave and return to his cell, but he was not given a *Miranda* warning or advised that he did not have to speak with the deputies. In finding the inmate was not "in custody" for *Miranda* purposes, the Court summarized the *Miranda* case law.

> As used in our *Miranda* case law, "custody" is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion. In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of "the objective circumstances of the interrogation, a "reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." And in order to determine how a suspect would have "gauged" his "freedom of movement," courts must examine "all of the circumstances surrounding the interrogation." Relevant factors include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning.

*Howes*, 132 S. Ct. at 1189 (internal citations omitted).

### b.     Analysis

The first indicia of custody identified by the *Griffin* Court involves what the suspect was told at the time of the examination. In determining whether a suspect is in custody during an interview, the Court places "significant emphasis" on whether "the defendant was told before his interview that he was not under arrest and that he was free to leave at any time." *United States v. Muhlenbruch*, 634 F.3d 987, 996-97 (8th Cir. 2011). In fact, the Court noted in *Czichray* that if a person is told repeatedly that he is free to terminate an interview, it is such "powerful evidence" that no governing precedent could be found which "holds that a person was in custody after being clearly advised of his freedom to leave or terminate questioning." 378 F.3d at 826. Here, Agent Gould did not tell Defendant that the questioning was voluntary, that he was free to leave, or that he was not under arrest. In fact, at the time of hearing, Gould testified that Defendant was *not* free to leave (although he apparently did not tell that to Defendant at the time).

Related to this issue is the question of whether Defendant was the "focus of the investigation." "Although custody is not inferred from the mere circumstance that the police are questioning the one whom they believe to be guilty, the fact that the individual has become the focus of the investigation is relevant 'to the extent that the suspect is aware of the evidence against him' and this awareness contributes to the suspect's sense of custody." *Griffin*, 922 F.3d 1348. Here, it is clear that Defendant was the "focus of the investigation" when he was led back to the DCI office and questioned by Agent Gould. Moreover, Defendant clearly understood that he was the focus of the investigation. Accordingly, the first *Griffin* factor weighs in favor of a finding of custody.

The second *Griffin* factor is whether Defendant "possessed unrestrained freedom of movement during questioning." Defendant was not placed in handcuffs, but he was led to the DCI office in the back of the casino, which is not open to the public. Agent Gould opined that the DCI office in the back of the casino "resembled more of just an office building," than a police station. It is undisputed, however, that "deprivations of freedom may occur in places other than the police station." *Id.* Gould had previously identified himself as a "state police officer" and displayed his badge, and the interrogation took place in his office. The interview room was located within the DCI's "main office." The record is silent regarding whether the doors to the interview room and/or main office were closed.

The facts here are similar to those in *United States v. Ollie*, 442 F.3d 1135 (8th Cir. 2006), where the suspect reported to the police station and was taken by an officer to "a small interview room." The officer sat alone with the suspect in the room and "left the door ajar." The district court found no evidence that the police restrained the suspect's freedom of movement. The Eighth Circuit noted, however, that "[s]uch a negative finding . . . is qualitatively different from stating that Mr. Ollie was free to move about. The record is silent on this issue because Mr. Ollie never tried to move about or leave the interview room." *Id.* at 1138. Similarly, there is no evidence in this case regarding

whether Defendant "tried to move about or leave the interview room." We know from Agent Gould's testimony, however, that *if* Defendant had attempted to leave, he would have been prohibited from doing so.

Similarly, in *Sanchez* the suspect was led to an office in the basement of the courthouse, normally used by the United States Attorney's Office. The interview was conducted in a small, closed room by two law enforcement officers, with other officers waiting outside. She was not handcuffed. "Sanchez did not attempt to leave, and it is unclear what would have happened if she had — particularly after Lavastida became more aggressive and called her a liar." 676 F.3d at 631. In considering the second *Griffin* factor, the Court concluded "it is unclear whether Sanchez's freedom of movement was restrained during the interview." *Id.*

The Supreme Court has emphasized that a restriction on the subject's freedom to leave is only one factor — albeit a necessary one to establish custody — in determining whether a subject is in custody for *Miranda* purposes.

> Determining whether an individual's freedom of movement was curtailed, however, is simply the first step in the analysis, not the last. Not all restraints on freedom of movement amount to custody for purposes of *Miranda*. We have "declined to accord talismanic power" to the freedom-of-movement inquiry, instead asked the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*. "Our cases make clear . . . that the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody."

*Howes*, 132 S. Ct. at 1189-90.

Here, it is unclear whether Defendant "possessed unrestrained freedom of movement during questioning." Defendant was questioned in an interview room contained within the main office of the DCI located in a part of the casino not open to the public, where he was led by Agent Gould. Defendant was not handcuffed, but would not have

been able to leave if he tried — although that fact was not communicated to Defendant. I believe the second *Griffin* factor weighs generally in favor of a finding that Defendant was in custody.

The third indicia of custody identified by *Griffin* is whether Defendant initiated contact with law enforcement or voluntarily acquiesced to official requests to respond to questions. Here, it is clear Defendant did not initiate contact with Agent Gould. This is not a circumstance where Defendant reported to the police station for questioning at Gould's request, but instead was instructed to accompany Gould to the back office for questioning. While Gould testified he "asked" Defendant to accompany him to the back, he also made it clear that Defendant's compliance was required. Gould displayed his badge while issuing his invitation and did not tell Defendant that his acceptance was voluntary. It can be argued that Defendant "acquiesced" to questioning by, in fact, answering questions. It can also be argued, however, that his compliance followed a reasonable perception that he had no choice. *See Sanchez*, 676 F.3d at 631. I believe this factor weighs in favor of a finding of custody.

The fourth *Griffin* factor militates against a finding that Defendant was in custody. That is, there is no evidence Agent Gould used "strong arm tactics or deceptive stratagems" during questioning. I note parenthetically, however, that the Court's task is made more difficult by Gould's election not to record the events, although the interview room where the questioning took place had that capability.

The fifth *Griffin* factor requires a determination of whether the "atmosphere of the questioning was police dominated." During most of the questioning, Gould and Defendant were the only persons present. In *Ollie*, the suspect was questioned in a small conference room at the police station, with only one officer present. The Court found that "the interview took place in a police-dominated atmosphere and that this atmosphere would have restrained a reasonable person's movements." 442 F.3d at 1139. The Court

reasoned that "[i]nterviews taking place on the police officers' 'home turf' are more likely to be police-dominated." *Id.* Similarly, the interview in this case took place on Agent Gould's "home turf." Defendant was taken to an interview room within the main office of the DCI, located in an area of the casino inaccessible to the public. I believe this factor weighs in favor of a finding of custody.

The sixth factor identified by *Griffin* is whether the suspect was placed under arrest at the termination of the questioning. Here, Defendant was arrested, although Gould testified that was not his intent when he initially took Defendant back to the office for questioning.

Another factor the Court must consider is the length of the interrogation. "[C]ustody has been found in relatively brief interrogations where the questioning is of a sort where 'the detainee is aware that questioning will continue until he provides his interrogators the answers they seek.'" *Howes*, 132 S. Ct. at 1189. Here, the record is silent regarding the length of the questioning. It appears, however, that it would have taken some time for Agent Gould to chase down the false information being provided by Defendant, until Defendant finally admitted his true identity after being shown a photograph of the real Hugo Salazar.

Every case is different and each case must be decided on its own facts. It is useful, however, to consider cases with similar facts. In *Ollie*, the defendant was instructed by his parole officer to go to the police station and meet with the chief of police, who was investigating whether Ollie possessed a firearm as a felon. Upon his arrival, the chief took Ollie to a small interview room, where the chief sat alone with Ollie and left the door ajar. The Court found that Ollie did not initiate contact with the police and, because his appearance at the police station was compelled, he did not voluntarily acquiesce to questioning. 442 F.3d at 1138. The Court found that the interview "took place in a police-dominated atmosphere and that this atmosphere would have restrained a reasonable

person's movements." *Id.* at 1139. After commenting that "[i]t is important to note that a decision on the matter of custody requires more than tallying a ledger," the Court concluded that "the parole officer's order that Mr. Ollie meet with Chief McNeill quite clearly tips the balance." *Id.* at 1140. The Court concluded that Ollie was in custody and the failure to advise him of his *Miranda* rights required suppression of his initial oral confession to the chief.

In *Sanchez*, a DEA agent led the suspect to an office in the basement of the courthouse, normally used by the United States Attorney's Office. Sanchez was then asked to enter an adjoining interview room, measuring about 15 feet by 12 feet with one door, which was closed behind her. Two officers were in the room with Sanchez, with officers waiting outside. One officer informed Sanchez that she was not under arrest, but she was not told her answers were voluntary or that she was free to leave. At one point, an officer raised his voice and called Sanchez a liar. The interview lasted 10 to 15 minutes and Sanchez was not arrested upon its conclusion. After weighing all of the factors and looking at the totality of the circumstances, the Court of Appeals agreed with the district court that "a reasonable person in Sanchez's position would have felt free to end the interview." *Id.* at 632. Accordingly, the Court concluded that Sanchez was not in custody and no *Miranda* warning was required. Unlike *Sanchez*, Defendant in the instant action was not told that he was not under arrest. Moreover, he was not told by Agent Gould that answering questions was voluntary or that he was free to leave. In fact, we now know that Defendant was *not* free to leave.

While determining whether a suspect is in custody for *Miranda* purposes is more complicated than simply tallying up the six *Griffin* factors, it must be noted that five of the factors weigh in favor of a finding of custody. Defendant was led to a small interview room located within the main office of the DCI at the back of the casino in an area not open to the public. He was not told that he was not required to answer questions, and was

not told he was free to leave. In fact, he was *not* free to leave. Defendant apparently had an identification card (albeit a fake) taken from him. In determining whether Defendant was in custody for *Miranda* purposes, "the ultimate test is whether a reasonable person in that position would have felt free to end the interview." *Sanchez*, 676 F.3d at 630-31. Based on the totality of the circumstances, I believe a reasonable person in Defendant's shoes would not have felt free to simply get up and walk away. Accordingly, Defendant was "in custody" for *Miranda* purposes.

### 2. *Interrogation*

#### a. *Applicable Law*

The Government argues that even if Defendant was in custody while being questioned by Agent Gould, he was not "interrogated." "[N]ot all government inquiries to a suspect in custody constitute interrogation and therefore need be preceded by *Miranda* warnings." *United States v. McLaughlin*, 777 F.2d 388, 391 (8th Cir. 1985). For *Miranda* purposes, "[a] question is an interrogation if it is 'reasonably likely to elicit' incriminating information." *United States v. Cowan*, 674 F.3d 947, 958 (8th Cir. 2012) (quoting *Pennsylvania v. Muniz*, 496 U.S. 582, 600-01 (1990)). A request for "routine information necessary for basic identification purposes" does not constitute interrogation for *Miranda* purposes. *Id. See also United States v. Brown*, 101 F.3d 1272, 1274 (8th Cir. 1996) ("It is well-settled that routine biographical data is exempted from *Miranda*'s coverage."). "A request for routine information necessary for basic identification purposes is not interrogation under *Miranda*, even if the information turns out to be incriminating." *McLaughlin*, 777 F.2d at 391. However, the "basic identification" exception does not apply when "the government agent should reasonably be aware that the information sought is directly relevant to the substantive offense charged." *Cowan*, 674 F.3d at 958 (quoting *McLaughlin*, 777 F.2d at 391-92).

For example, asking a defendant his address and telephone number in a post-arrest interview did not violate *Miranda*. *United States v. Sims*, 719 F.2d 375, 378-79 (11th Cir. 1983) (cited with approval in *McLaughlin*, 777 F.2d at 391). Questions regarding a defendant's marital status and children does not require a *Miranda* warning. *United States ex rel. Hines v. LaVallee*, 521 F.2d 1109, 1112-13 (2d Cir. 1975) (cited with approval in *McLaughlin*, 777 F.2d at 391). Questions by a pretrial services officer regarding a defendant's place of employment does not require a *Miranda* warning because "[s]uch an inquiry constitutes a request for basic identification information." *McLaughlin*, 777 F.2d at 392 (although it should be noted that the questioning was by a pretrial services officer, and employment is a "factor properly considered" in determining pretrial release).

### b.    Analysis

As noted earlier, the Court's task in this case is made more difficult by Agent Gould's failure to record the discussion in the interview room, even though the space had video-recording capability. Instead of knowing precisely what questions were asked and what responses were given, the Court must rely on Gould's recollection of the encounter. I believe Gould was a credible witness, and I do not imply that he would intentionally misstate the facts, but like any witness, Gould's memory is not infallible.

Agent Gould testified that after asking Defendant to have a seat in the interview room, "I would have been asking him questions as far as, you know, 'is this ID you?'" Initially, Defendant "maintained that it was him." Gould continued his investigation by checking the name and birth date on the identification card against databases in Iowa and California. There was no match in California or Iowa, but there was a "hit" in Texas with that name and date of birth. According to Gould, "it came back to an individual that had been arrested for sexual assault of a minor in the state of Texas." Until that point, there is no evidence that Gould asked Defendant any questions other than "is this ID you?"

After obtaining the "hit" in Texas, Agent Gould "confronted" Defendant with the information. Gould testified that "I basically asked him were you arrested in Texas for sexual assault." According to Gould, Defendant's reaction was slow, he appeared surprised, and "he kind of acknowledged yes." Gould was skeptical of Defendant's answers, however, and therefore checked a Texas sex offender registry and obtained a photograph of Hugo Salazar. The photograph did not match Defendant.

After discovering the additional information, Agent Gould returned to questioning Defendant. Gould showed the photograph to Defendant and said "this is not you," and Defendant then admitted that he was not Hugo Salazar. The record is imprecise as to what additional questions may have been asked, but Gould testified that Defendant "informed me of his true identity and his real information." Gould learned in "talking with" Defendant that he had entered the country on a visa and overstayed. He also learned that he went to high school in Cedar Rapids and was employed at Heinz in Cedar Rapids.

Agent Gould's initial questioning of Defendant was an attempt to determine his identity. The questions were prolonged somewhat by Defendant's false answers. I believe, however, that the questions leading up to Defendant disclosing his real name were "necessary for basic identification purposes" and were not, therefore, prohibited by *Miranda*. *Cowan*, 674 F.3d at 958. At that point, Gould had no information that Defendant was in the country illegally or that he had unlawfully used a social security number and made a false claim to United States citizenship in order to obtain employment. For all Gould knew, Defendant was an underage college student trying to unlawfully enter the casino. That is, Gould could not reasonably have been aware that establishing Defendant's identity was "directly relevant to the substantive offense charged." *Id.*

It would appear, however, that Agent Gould's continued questioning went beyond that which was necessary to establish Defendant's identification. In *Cowan*, the Court concluded that the detective's question asking the defendant "how he arrived at the

18

apartment was not an interrogation because it was a 'request for routine information necessary for basic identification purposes.'" *Id.* (quoting *Brown*, 101 F.3d at 1274). However, the Court concluded that the detective's next question — why Cowan had car keys if he arrived by bus — "exceed[ed] a routine, basic identification inquiry and became an interrogation." *Id.* Here, Gould asked a series of questions "for basic identification purposes." Gould then asked Defendant "why did you not tell me who you were from the beginning?" At that point, Defendant admitted he was in the country illegally and did not want to be deported. I believe the "why" question asked by Gould exceeded "a routine, basic identification inquiry and became an interrogation." Because Defendant was in custody, I believe a *Miranda* warning was required before the questioning could continue. Because no *Miranda* warning was given, I believe that questions and answers which occurred after Gould established Defendant's identity must be suppressed.

## C. Fruits of the Unlawful Interrogation

Defendant asserts that "the evidence to bring this prosecution arose from the fruits of the illegal seizure and unlawful interrogation." That is, Defendant argues that but for the information obtained during the custodial interrogation, the Government would not have independently obtained the I-9 form completed by Defendant at Heinz, which constitutes the factual basis underlying the instant charges. In response, the Government argues that Defendant's identity or his state court conviction cannot be suppressed as fruit of the poisonous tree. Furthermore, the Government argues that statements made following Defendant's arrest on these federal charges more than five weeks later are clearly admissible because he was given a *Miranda* warning and signed a written waiver.

As set forth above, I believe Agent Gould had an articulable and objective basis to suspect Defendant was attempting to gain entrance to the casino by using a fake identification card. That is, Gould had "reasonable suspicion" to believe Defendant was engaged in criminal activity — the unlawful use of an identification card in violation of

Iowa Code § 321.216. Accordingly, as previously discussed, Gould was permitted under the Fourth Amendment to briefly detain Defendant to investigate his suspicions. I also believe, however, that Defendant was "in custody" for *Miranda* purposes when he was led back to the interview room in the DCI office at the back of the casino, without being told that his cooperation was voluntary and he was free to leave. At that time, Gould was authorized to ask Defendant "basic identification" questions, notwithstanding the fact that Defendant was not given a *Miranda* warning.

During the initial questioning — which was *not* an "interrogation" as that term is used in *Miranda* — Agent Gould learned Defendant's true identity and established probable cause to believe Defendant had violated Iowa Code § 321.216. At that point, Gould was authorized to arrest Defendant for unlawfully using an identification card and, in fact, Defendant was arrested and taken to the Washington County Sheriff's Office, where he was "booked." Defendant was photographed and his fingerprints were taken. Using this information, Agent Autio was able to retrieve Defendant's visa application.[2] Further investigation would reveal Defendant had overstayed the visa.

Defendant is not charged with being in the country illegally, however, or overstaying his visa. Instead, Defendant is charged with unlawfully using a social security card, misusing a social security number, and making a false claim to citizenship on a form I-9, in order to obtain employment at Heinz in Cedar Rapids. Agent Autio testified that he contacted Heinz after reading the DCI report, which revealed that Defendant disclosed his employer while being questioned by Agent Gould. As indicated above, I believe that questions posed by Gould after establishing Defendant's identification constituted a custodial interrogation without the required *Miranda* warning. That is, the only way Autio

---

[2] Agent Autio testified that the fingerprints were faxed to him and the quality did not permit them to be used. Accordingly, Autio conducted his investigation without Defendant's fingerprints.

knew that Defendant worked at Heinz was by reading a report describing answers given by Defendant in response to questions posed in violation of *Miranda*. The exclusionary rule applies "whenever evidence has been obtained 'by exploitation' of the primary illegality instead of 'by means sufficiently distinguishable to be purged of the primary taint.'" *United States v. Guevara-Martinez*, 262 F.3d 751, 755 (8th Cir. 2001) (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)). Here, evidence regarding Defendant's identity and visa status were properly obtained from answers given to Agent Gould and during the booking process following his arrest. Evidence regarding Defendant's employment, however, was obtained during a custodial interrogation without the benefit of a *Miranda* warning. Autio was then able to "exploit" the *Miranda* violation by contacting Defendant's employer.

As the Government correctly notes, "[t]he 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred."[3] *I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1039 (1984). *See also United States v. Flores-Sandoval*, 422 F.3d 711, 715 (8th Cir. 2005). I agree with the Government that "Defendant's booking responses and plea of guilty in related state criminal proceedings provide 'untainted identity evidence' that may be used in this federal prosecution."[4] The Government is not prohibited in this case from offering evidence regarding Defendant's identity, or that he was charged and pled guilty in state court for

---

[3] Recently, in a case where the defendant was charged with illegal reentry into the United States, I noted in my Report and Recommendation that the defendant's motion to suppress had "limited practical effect" because even if the case was dismissed, authorities could simply retake custody of the defendant and charge him again without using the tainted evidence. *See United States v. Tamayo-Baez*, No. 3:14-cr-03055-LRR, Report and Recommendation (docket number 23) at 10-11 (citing *Flores-Sandoval*, 422 F.3d 711 (8th Cir. 2005)).

[4] Government's Resistance (docket number 24) at 9.

unlawfully using an identification card. The fighting issue, however, is whether the Government is entitled to use evidence obtained by Agent Autio by contacting Defendant's employer, when information regarding the employer was obtained in violation of the Fourth Amendment.

The Government argues that even if statements made by Defendant in response to Agent Gould's questioning are inadmissible, his answers to Agent Autio's questioning following his arrest in the instant action are admissible. The grand jury returned an indictment in this case on October 30, 2014, and a warrant was issued for Defendant's arrest. Autio testified that Defendant was arrested on November 4. Following his arrest, Defendant was read a statement of rights and signed a waiver, indicating he understood his rights and was "willing to answer questions without a lawyer present." *See* Government's Exhibit 5. According to Autio, Defendant then admitted that he purchased documents bearing the name of Hugo Salazar and used those identifiers in filling out form I-9 to obtain employment. Defendant does *not* deny being read a *Miranda* warning and signing a waiver. Moreover, Defendant does *not* claim that his waiver was involuntary or that his statement to authorities following his arrest was involuntary. Accordingly, the issue is whether Defendant's *Mirandized* statement on November 4 was "obtained by exploitation of the primary illegality" or instead was "sufficiently distinguishable to be purged of the primary taint."

In *Oregon v. Elstad*, 470 U.S. 298, 300 (1985), the Court considered the issue of "whether an initial failure of law enforcement officers to administer the warnings required by *Miranda v. Arizona*, without more, 'taints' subsequent admissions made after a suspect has been fully advised of and has waived his *Miranda* rights." The Court concluded that the admissibility of a subsequent *Mirandized* statement would not be analyzed under the fruit of the poisonous tree doctrine, but instead would turn on the issue of whether the *Mirandized* statement was given voluntarily.

> It is an unwarranted extension of *Miranda* to hold that a
> simple failure to administer the warnings, unaccompanied by
> any actual coercion or other circumstances calculated to
> undermine the suspect's ability to exercise his free will, so
> taints the investigatory process that a subsequent voluntary and
> informed waiver is ineffective for some indeterminate period.
> ***Though Miranda requires that the unwarned admission must
> be suppressed, the admissibility of any subsequent statement
> should turn in these circumstances solely on whether it is
> knowingly and voluntarily made.***

*Elstad*, 470 U.S. at 309 (emphasis added). More recently, the Court in *Missouri v.*
*Seibert*, 542 U.S. 600 (2004), cited the holding in *Elstad* with approval.

> [T]he Court in *Elstad* rejected the *Wong Sun* fruits doctrine for
> analyzing the admissibility of a subsequent warned confession
> following "an initial failure to administer the warnings
> required by *Miranda*." . . . "Though *Miranda* requires that
> the unwarned admission must be suppressed, the admissibility
> of any subsequent statement should turn in these circumstances
> solely on whether it is knowingly and voluntarily made."

*Seibert*, 542 U.S. at 612 (quoting *Elstad*). The Eighth Circuit Court of Appeals applied
this principle in *United States v. Rodriguez-Hernandez*, 353 F.3d 632, 635 (8th Cir. 2003),
and *United States v. Villalba-Alvarado*, 345 F.3d 1007, 1013 (8th Cir. 2003).

For the reasons discussed above, I believe the unwarned statements made by
Defendant in response to Agent Gould's interrogation in the DCI office must be
suppressed. However, Defendant's *Mirandized* statement given following his arrest 38
days later cannot be considered fruit of the poisonous tree. *Elstad*, 470 U.S. at 309.
Instead, the admissibility of Defendant's *Mirandized* statements must be judged on the
standard of voluntariness. *Id. See also Villalba-Alvarado*, 345 F.3d at 1010 ("En route
to reaching the conclusion that a subsequent, warned statement was to be judged under the
pre-*Miranda* standard of voluntariness rather than suppressed as fruit of the poisonous tree,
the [*Elstad*] Court restated its general position that the exclusionary rule and the fruits

23

doctrine apply differently to *Miranda* violations under the Fifth Amendment than to unreasonable searches under the Fourth Amendment."). Here, Defendant does *not* argue — nor is there any evidence to support an argument — that the waiver of his *Miranda* rights or his subsequent statement following his arrest were anything other than voluntary. Accordingly, statements made by Defendant to Agent Autio after being *Mirandized* are admissible at trial.

### D. Summary

In summary, I believe Agent Gould had reasonable suspicion to believe Defendant was unlawfully using a fake identification card. Accordingly, Gould was authorized to briefly detain Defendant to investigate his suspicions. When Defendant was led back to the interview room in the DCI office at the back of the casino, however, he was in custody for *Miranda* purposes. Nonetheless, Gould was permitted to ask Defendant basic identification questions, notwithstanding the fact that Defendant was not given a *Miranda* warning. Accordingly, Defendant's answers to questions regarding his identification are admissible. When Gould began seeking further details, however, by asking "why" Defendant had lied, it was an unwarned custodial interrogation and Defendant's responses are inadmissible at trial. Following his arrest five weeks later, Defendant was *Mirandized* and voluntarily waived his rights and agreed to answer questions. Accordingly, statements made by Defendant in response to questions by Agent Autio are admissible.

### V. RECOMMENDATION

For the reasons set forth above, I respectfully recommend that the Motion to Suppress (docket number 22) filed by the Defendant be **GRANTED in part** and **DENIED in part**, as set forth in the Summary found in Part IV(D).

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded*

*that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections." Accordingly, if the parties are going to object to this Report and Recommendation, they must promptly order a transcript of the hearing held on December 18, 2014.*

DATED this ___9th___ day of January, 2015.

_____
JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA